710 So.2d 362 (1998)
Joan Renken McKEE, Appellee,
v.
Douglas S. HAYWARD, Sr., and Germania Plantation, Inc.
Succession of Helene Reuss HAYWARD.
Joan Renken McKEE
v.
Douglas S. HAYWARD, Sr., et al.
John R. HAYWARD
v.
William C. HAYWARD, Jr., et al.
John R. HAYWARD
v.
Douglas S. HAYWARD, Sr.
No. 97 CA 0553.
Court of Appeal of Louisiana, First Circuit.
April 8, 1998.
Rehearing Denied June 2, 1998.
*364 Gideon T. Stanton, III, New Orleans, for Appellee Joan Renken McKee.
Sam J. D'Amico, Baton Rouge, for Douglas S. Hayward, Sr., Appellant.
John R. Hayward, Waveland, MS, pro se.
Before LOTTINGER, C.J., and SHORTESS and FOGG, JJ.
SHORTESS, Judge.
William Campbell Hayward (Hayward) and Helene Reuss Hayward (Mrs. Hayward) had four children: William C. Hayward, Jr., Douglas S. Hayward, John R. Hayward, and Helene Hayward Renken (Renken). Renken predeceased her parents, leaving one daughter, Joan Renken McKee. Douglas was executor of his mother's estate and trustee of her trust. He is also president of Germania Plantation, Inc., (Germania), which owns the family plantation. For years William, Douglas, John, and Joan have been squabbling. In 1985 they agreed to settle their differences and entered into a written agreement. They did not abide by the terms of that agreement, however, and at least nine lawsuits resulted. Nine suits were consolidated at the trial court level, four of which were dismissed before trial. The remaining suits were tried jointly.
The trial court issued lengthy reasons for judgment in June 1995, as well as a judgment dealing with only some of the issues before it. In September 1996, the trial court issued supplemental reasons for judgment and two more judgments. Each of the three judgments is captioned with eight suit numbers. The decrees in the judgments are different, each being directed to a particular heir. Douglas appealed both the June 1995 and September 1996 judgments. By order of this court, all these matters were consolidated as one appeal.
Douglas has appealed the portions of the trial court's judgments that direct him to transfer shares of stock in Germania to Joan, John, and William, to pay attorney fees to Joan and John, to pay a sum of money to Joan, and to deliver certain property to Joan. We shall first address the property claimed by Joan.

PROPERTY CLAIMED BY JOAN
The property in dispute includes two paintings and leaves that convert a square dining table into a larger oval table, as well as a watch chain and fob. Joan contends her great grandmother, Bertha Spor Reuss (Reuss), bequeathed the paintings and the table to her mother, Renken. Joan was Renken's only child and inherited all her property. Douglas, however, contends he owns the paintings and leaves, either through a bequest from his mother of all Germania Plantation furnishings or, alternatively, through acquisitive prescription. He does not contest Joan's ownership of the watch chain and fob but claims he has no knowledge of their whereabouts.
Joan testified her mother inherited the table and paintings from Reuss, but after Joan's father died and the family was forced to move to a smaller house, many of their furnishings, including the paintings and table leaves, were moved to Germania. Douglas testified he "may have influenced" his mother not to give the paintings back because he wanted them. They are currently hanging in the house where Douglas resides. Douglas also has possession of the table leaves, although Joan has the square center portion of the table. Douglas contends the table and paintings belonged to his mother and he inherited them from her. Alternatively, he contends his mother owned the paintings and table through acquisitive prescription as they have been at Germania Plantation since approximately 1959.
*365 Title to movables may be acquired through prescription of three years by a good-faith possessor or ten years by a bad-faith possessor.[1] The party asserting acquisitive prescription has the burden of proving all facts essential to support it.[2] One essential element of a claim of acquisitive prescription is the intent to possess the property as owner; mere physical possession is insufficient.[3] Furthermore, possession for the convenience of another gives the possessor neither legal possession nor the right of prescribing.[4]
The trial court obviously believed Joan's testimony that Mrs. Hayward was holding the paintings and table leaves at Germania for Renken's convenience. The court rejected Douglas's plea of prescription, holding the property belonged to Renken and thus could not be bequeathed to Douglas by his mother. This is a factual determination; it cannot be disturbed by the appellate court unless it is manifestly erroneous or clearly wrong.[5] We find no manifest error in this factual determination.
Douglas does not dispute Joan's claim to the watch fob and chain, which were bequeathed to Renken by Hayward. According to Joan's uncontroverted testimony, the chain and fob were last seen about a week before Renken's death in 1981. Renken, on her deathbed, asked Douglas and her mother to visit her and bring the chain and fob, which they did. Douglas showed them to Renken, then put them back in his pocket and left. He testified he does not know what happened to them, but stated that if he could find them, he would give them to Joan.
The trial court ordered Douglas to give Joan the table leaves and paintings within sixty days of the date the judgment in this case becomes final. If he fails to do so, the judgment authorizes Joan to search Germania for those items at a time of her choosing. The court also ordered that Joan be permitted to conduct a search at a time of her choosing, accompanied by a deputy sheriff, for the watch chain and fob. Douglas contends this order invades his privacy.
Louisiana Civil Code article 4 provides that when no rule for a particular situation can be found in legislation or custom, a court is bound to proceed according to equity, resorting to justice, reason, and prevailing usages. A trial court has great discretion in fashioning an equitable remedy, but it may do so only when there is no express law applicable.[6] Douglas admitted at trial that the paintings were hanging on the wall of his home and the table leaves were also in his home. If he defies the judgment and secretes the property, he will be in contempt of court. Because there is a remedy at law if he refuses to deliver the property to Joan within the time set by the court, the trial court committed legal error in fashioning an equitable remedy, and that portion of the judgment must be reversed.
The watch chain and fob are a different story, however. Douglas disclaimed knowledge of their whereabouts, but when last seen, they were on their way to Germania in Douglas's pocket. The trial court fashioned an equitable remedy by ordering that Joan be allowed to search the property accompanied by a deputy. These suits have been pending before the trial court for years, and the court appeared thoroughly familiar with the parties involved. The court obviously felt this order was necessary to achieve the objective of returning the watch fob and *366 chain to Joan. This trial court faced an uncommon problem that required an uncommon solution. It did not abuse its discretion.

TRANSFER OF STOCK
In the 1985 contract intended to settle the disputes among the heirs, Joan, Douglas, and John agreed as follows regarding the transfer of stock:
WHEREAS, Douglas S. Hayward, Sr.[,] Joan Renken McKee, and John Reuss Hayward, appearers, and William Campbell Hayward, Jr., another heir of William Campbell Hayward, are entitled to be placed in possession of the remaining fifty (50%) per cent of the Class A voting stock of Germania Plantation, Inc. in equal shares (i.e. 75 shares each) by reason of an Order of the Court issued in the Succession of William Campbell Hayward, Sr.; and
....
WHEREAS, all of the parties hereto wish to settle and compromise many of the various issues and controversies existing among them in the three legal proceedings referenced above; ... and to agree upon a plan which will be in the best interest of all of the heirs of William Campbell Hayward, Sr. and Helene Reuss Hayward, including William Campbell Hayward, Jr., who is not a party to this Agreement; and
WHEREAS, in consideration of the consent and agreement of the various parties hereto to this Agreement and the further considerations and concessions made herein my the various parties hereto and in order to effect a settlement and compromise of all of the various issues and controversies presented herein:
IT IS HEREBY AGREED, COVENANTED AND CONTRACTED by and between the parties each on his own behalf and on behalf of any and all of his heirs, successors and/or assigns, as follows:
....
With respect to Germania Plantation, Inc., Douglas S. Hayward, Sr. does hereby agree and consent on his own behalf and on behalf of his heirs, successors and assigns that on or before the expiration of three (3) years from the date of this Agreement, that he will transfer and convey unto Joan Renken McKee and John Reuss Hayward or their respective heirs or assigns, one-fourth (¼th) each (i.e. 75 shares each) of the Class A voting stock of Germania Plantation, Inc., which said Douglas S. Hayward, Sr. received from his mother, Helene Reuss Hayward by reason of the Act of Donation dated December 2, 1982.
....
Douglas S. Hayward, Sr. further agrees to convey one-fourth (¼th) of the Class A stock of Germania Plantation, Inc. (i.e. 75 shares), which Douglas S. Hayward, Sr. received from his mother, Helene Reuss Hayward, in an Act of Donation dated December 2, 1982, but only in the event that William Campbell Hayward, Jr. agrees to convey the "key" lot in Waveland, Mississippi to John Reuss Hayward and enters into all of the covenants and agreements set [forth] in this entire document. Said conveyance is to be made within three (3) years from the date of this Agreement, if fulfillment of the above conditions occurs.
....
All the parties hereto agree and consent to the execution of any and all documentation necessary to effect the above referenced agreements and covenants and to cooperate fully to bring about the conclusion of all these matters as expeditiously as possible.
Despite the agreement, Douglas never transferred the stock. In 1991, John obtained a declaratory judgment against Douglas recognizing the validity of the 1985 agreement and recognizing John's entitlement to the stock.[7] Douglas still did not transfer the stock. He testified he did not do so because the corporation never adopted the "blood-line amendment" to Germania's articles *367 of incorporation. This amendment, which the parties agreed to in the 1985 contract, would restrict sale of the stock to direct descendents of William C. Hayward and Helene Reuss Hayward. He stated that "certain covenants set forth in the ... Agreement ... were important ... to [him] giving up the Class A stock. And one of the ones ... was, in particular, the blood line." The trial court, however, held the blood-line amendment was not related to Douglas's duty to transfer the Class A stock to the other heirs.
On appeal, Douglas argues the blood-line amendment was a principal cause of the contract and the failure of the parties to comply with the portion of the agreement rendered it unenforceable. This argument lacks merit. Douglas owns the controlling shares of stock in the corporation, and when the blood-line amendment was voted on by the Class A shareholders, Douglas abstained rather than vote in favor of the amendment and break a tie between Joan and John. Thus, he himself prevented the blood-line amendment from being enacted, and he cannot now rely on that fact as an excuse for not transferring the stock to the other heirs. Furthermore, the trial court's determination that the blood-line amendment was not a principal cause of the agreement is a factual determination that cannot be reversed on appeal in the absence of manifest error. We find no manifest error in the trial court's determination.
Douglas also argues the stock transfer cannot be completed because the trial court failed to order Germania to transfer the stock. Although Germania was not a party to the lawsuit, we agree with the following statement by the trial court: "A corporation does not act in and of itself. It acts through its officers." The court concluded that if John was entitled to issuance of the stock, Douglas, as president of the corporation, was required to issue it. Douglas controls the corporation. The court has ordered Douglas to transfer the stock as he agreed to do thirteen years ago. He cannot thwart his obligation by putting on his corporate-president hat and declaring Germania will not accept the transfer. We affirm the trial court's ruling ordering Douglas to transfer the stock to Joan and John.
We must agree, however, with Douglas's complaint that the trial court erred in ordering him to transfer stock to William. William did not claim entitlement to his stock in any of the many suits litigated in this trial. His only claim was for the $25,000.00 promised him in the agreement. A court cannot grant relief not sought by a party. The trial court committed legal error in ordering Douglas to transfer stock to William, and we must reverse that portion of the judgment.

CERTIFICATES OF DEPOSIT
In the 1985 agreement, Douglas and Sidney A. Marchand, III, as trustees of Mrs. Hayward's trust, agreed to distribute the assets of the trust equally to the four heirs. This included two certificates of deposit totaling $207,858.54. Marchand testified he never had possession of any of the assets and took no steps to distribute them. He stated he thought Douglas would distribute the assets. He resigned as trustee because he thought his duties were over.
The judgment of possession in this succession states Douglas is discharged as executor and a final accounting is waived. Douglas contends Joan thus waived any claim against him for failure to distribute succession assets. Joan contends, however, that there was an agreement among the heirs that when the C.D.'s matured, the proceeds would be distributed equally among the heirs. She explained that Mrs. Hayward's will provided for a spendthrift trust, but all the heirs wanted to do away with the trust and distribute the assets. They agreed to this in writing on March 14, 1986.
Because they would lose interest on the C.D.'s if they withdrew them before the maturity date, they agreed to leave them in the bank until maturity. Joan testified Douglas agreed to give each of the heirs one-fourth of the C.D. proceeds immediately after the C.D.'s matured. She checked with the bank and found Douglas had withdrawn the C.D's but had never distributed the funds. The trial court found the minutes of the May 5, *368 1986, shareholders' meeting confirmed the existence of this agreement:
The treasurer advised that the only records the president allowed him to examine were for the years 1981 through 1984 and that those records were not complete because the records on 2 Certificates of Deposits (sic) for $100,000 each, or $200,000 are missing and the 1985 financial records were never turned over to him. The treasurer also advised that monies from various accounts (up to December 31, 1984) totaling $353,837.33 had been transferred to the president[`]s personal bank account. The president [thereupon] advised that those monies that went into his personal account can all be accounted for. That he leaves that up to his [bookkeeper] to allocate to what accounts the monies belong. The President, after questioning advised that he would have a complete accounting and the records would be made available two weeks from this date, or on May 19, 1986.
Despite Douglas's testimony that there were insufficient funds to pay the debts of the succession, the detailed descriptive list of the succession shows the succession had a net estate for taxation of $431,302.15. It also shows separate liquid assets, including the two C.D.'s, of $291,867.21.[8] Joan testified it was her understanding that after the succession debts were paid, one-fourth of the remaining funds would be distributed to her.
The liquid assets of the estate were never placed in a separate account but were commingled with Germania's funds. Douglas introduced checks written on Germania's account totaling $131,549.39,[9] which he testified were payments for debts of the succession. The trial court found that Douglas failed to account for $53,687.27, and that Joan was entitled to one-fourth of that amount, or $13,421.81. Neither attorney could explain in brief how the court arrived at this figure, and we are unable to fathom it ourselves. However, we believe Joan was entitled to at least that much, for the following reasons.
It is undisputed that Douglas commingled the C.D. funds of $207,858.54 with the Germania account. He proved he paid succession debts totaling $131,549.39 from the Germania account. This leaves a balance of $76,309.15 unaccounted for. Douglas testified he used all those funds and more to pay succession debts, but he offered no corroboration of that testimony. The trial court obviously believed there were funds remaining. This factual finding is not manifestly erroneous.

ATTORNEY FEES
The 1985 agreement provided for attorney fees and costs to be assessed against any party who reneged and forced the others to 1986. file suit for compliance.[10] The trial court awarded attorney fees of $43,316.37 to Joan and $12,049.00 to John. Douglas contends the trial court abused its discretion and awarded excessive attorney fees to Joan and committed legal error in awarding attorney fees to John.

John
The $12,049.00 in attorney fees awarded to John represents the amount his lawyer testified was incurred in bringing the suits against Douglas through trial, $10,049.00, plus $1,500.00 for "final memorandum and closing." Douglas contends John waived his claim to attorney fees during trial. John testified he felt each party should pay his own attorney fees, and he was not making a claim against Douglas for them:
[On Direct Examination]

*369 Q. And have you incurred attorney's fees in enforcing that September 13th Agreement?...
A. No, I don't want toI will pay my own way in this.
Q. Tell the Judge your feelings on this.
A. My feeling is that each of us ought to pay our own way....
....
BY THE COURT:
....
Q. And I want to know about whether or not you have incurred any attorney's fees from [Mr. Waguespack], and I would be interested in knowing whether you intend to pay him.
A. I told Mr. Waguespack that you told me I had to hire him.
Q. No, sir, I did not. I said you had to have an attorney when you came to court....
....
Q. You could keep Mr. Waguespack or hire a new one, but I didn't want you to hire a new one and have him move for a continuance. That's what I told you.
A. Absolutely. And I hired Mr. Waguespack and I am going to pay him. I am not after any.... So I am paying him. I hired him, and I don't expect nobody to pay him but me. Now.
....
[Cross-examination]
Q. Well, as I understand it, Mr. John, you are not making a claim against Mr. Douglas Hayward for paying your attorney's fees. Is that correct?
A. Absolutely.
(Emphasis added.)
On appeal, John denies the above testimony was a waiver of his right to attorney fees from Douglas. He contends in his brief that he was merely trying "to make clear to the trial court that he was aware that he was personally liable to his own attorney for the fees he had incurred." However, his testimony on cross-examination that he was "absolutely" not making a claim against Douglas for attorney fees was a clear and unequivocal waiver.
A party has the right to waive or withdraw a claim. Once a party has waived a claim through his testimony, under oath, it is error for the trial court to grant an award for that claim. Thus, we must reverse the portion of the trial court judgment that awards attorney fees to John.

Joan
Douglas does not dispute that if Joan prevails on the transfer of stock issue, which she has, she is entitled to attorney fees under the 1985 agreement. His primary contention on appeal is that the attorney fees awarded her by the trial court are excessive. Douglas's counsel characterizes this litigation in brief as "a simple contract issue" that "could not have possibly cost Joan Renken McKee $43,316.37 as awarded by the trial court." He claims the only issue under the 1985 contract that was tried was the transfer of stock.
While this might have begun as a "simple contract issue," these consolidated cases seem to have mutated into something much more complex. The trial lasted two weeks. The appellate record is 954 pages long, and that does not include five volumes of pleadings from the consolidated cases or an envelope thick with exhibits. Furthermore, the parties have filed multitudinous briefs on the "simple" issue of whether the 1985 agreement was breached by Douglas.
Joan testified at length about the attorney fees she had been billed and had paid. She introduced three in globo exhibits comprising bills from her attorneys from 1987 through 1995. These bills totaled over $90,000.00 but included representation for several matters other than these cases, including negotiations with Shell Oil over the sale of Belle Helene Plantation and an assault suit. She attempted to separate the fees arising from the 1985 agreement from other legal matters. For example, one bill was for $36,173.50, but she stated only $180.00 was related to this matter. While she began by testifying to the amounts related to the "Class A stock dispute," for which she clearly was entitled to attorney fees, later she testified as to the portion of the bill related to "this case." She *370 testified she had reviewed the bills to the best of her ability and believed the amounts she testified to were fair and accurate.
According to Joan, $40,496.37 in fees and costs were related to this litigation.[11] Not all this litigation, however, involved the 1985 agreement. Joan is entitled to attorney fees only on the matters covered by this agreement. The trial court noted the 1985 agreement was supposed to settle the differences among all the parties for the many controversies they were involved in. The issues in these cases are so intermingled it would have been very difficult to determine what portion of this litigation is not related to settling the differences between the parties regarding the Haywards' estates had the parties not entered into a stipulation on that issue.
At the conclusion of Joan's testimony on this issue, her counsel stated as follows:
Counsel would like to enter into the record that Mr. D'Amico and Mr. Stanton, and the authority of their clients, agree to stipulate that as to all attorney's fees bills we have submitted today, ... that the proportionate amount on the furniture is 40 percent of the fees and costs. The proportionate amount on the Class A stock is 30 percent fees and costs. And the proportionate amount on the C.D.'s issue is 30 percent fees and costs.
That stipulation does not mean that Mr. D'Amico is agreeing that they owe any attorney's fees and costs. It is simply a proportionate stipulation. Have I stated that correctly, Mr. D'Amico?
Douglas's counsel then replied:
That's correct, if Your Honor please.... And that would be if the Court should decide there are any attorney's fees, the Court will decide the amount of the attorney's fees, and then they will be pro-rated accordingly.
(Emphasis added.)
Despite this stipulation, the trial court did not pro-rate the attorney fees. It took the figure Joan testified to at trial, added $3,000.00 for the cost of trial and post-trial matters, and awarded that entire amount. Douglas contends the court should have awarded only thirty percent of that figure, the percentage they stipulated was attributable to the Class A stock dispute, or at most, sixty percent, for the Class A stock and the C.D. disputes.
In light of this stipulation, we are constrained to agree that the trial court erred in failing to pro-rate the attorney fees. We find the stock and the C.D. disputes were both related to Douglas's failure to abide by the 1985 agreement. The trial court should have deducted forty percent from the total fees as the furniture dispute was not part of the 1985 agreement. We have set forth the fees that Joan stated were related to this case in the appendix attached hereto. Those fees, plus the $3,000.00 assessed by the trial court for trial and post-trial matters, total $43,496.37. Sixty percent of that figure is $26,097.82. Thus, we must amend the attorney fee award to Joan and reduce it from $43,316.37 to $26,097.82.
Douglas also contends the attorney fees should have been apportioned among all the heirs and not assessed solely against him. Joan's counsel, however, stated during trial that Joan was seeking attorney fees against only Douglas, and not John or William, because "all of the legal work ... has been created by either omissions or commissions of Douglas...." We agree with that statement and find the trial court correctly assessed attorney fees against Douglas.

CONCLUSION
For the foregoing reasons:
The portion of the judgment of June 28, 1995, ordering Douglas Hayward to pay attorney fees of $12,049.00 to John R. Hayward is reversed. In all other respects, that judgment is affirmed;
The portion of the judgment concerning William Hayward, Jr., of September 30, 1996, that orders Douglas Hayward to transfer stock to William Hayward, Jr., is reversed.
*371 In all other respects, that judgment is affirmed.
The portion of the judgment concerning Joan Renken McKee of September 30, 1996, permitting her to conduct a search of Germania Plantation for the Bettinger pictures and dining table leaves if Douglas Hayward does not deliver them to her within sixty days of the final judgment is reversed. The portion of that judgment ordering Douglas Hayward to pay Joan Renken McKee attorney fees of $43,316.37 is amended to reduce that award to $26,097.82. In all other respects, that judgment is affirmed.
All costs of this appeal are assessed to Douglas Hayward.
REVERSED IN PART, AMENDED IN PART, AFFIRMED IN PART.

APPENDIX

 McCune Bills
 Amounts McKee Says
Date Total Bill Are Related to Litigation
12/23/87 $10,764.75 $ 9,764.75
10/27/88 6,698.60 2,232.70
6/4/90 5,048.00 1,009.60
7/6/90 1,460.00 1,460.00
9/7/90 1,660.00 --0--
6/21/93 36,173.50 180.00
 __________ __________
 $61,804.85 $14,647.05
Costs claimed but not
included in McCune bills 430.00
 Guste, Barnett & Shushan bills
1/17/94 $ 2,283.45 $ 2,283.45
2/3/94 1,116.04 1,116.04
5/11/94 4,215.17 4,215.17
9/15/94 2,025.00 2,025.00
1/6/95 2,060.84 1,725.00
2/1/95 1,327.13 200.00
4/17/95 4,443.20 2,275.00
5/15/95 13,079.66 11,579.66
 ___________ __________
 $30,550.49 $25,419.32
Additional fees awarded
by trial court for trial and
post trial memorandum 3,000.00
 __________
TOTAL FEES & COSTS
RELATED TO THIS LITIGATION $43,496.37
 LESS 40% FOR
 FEES & COSTS RELATED
 TO FURNITURE
 DISPUTE (17,398.55)
 __________
 TOTAL FEES DUE
 JOAN McKEE $26,097.82

NOTES
[1] La.C.C. arts. 3489-3491. (Prior to the 1982 revision of the Civil Code, effective January 1, 1983, the substance of these articles was found in Civil Code articles 3476, 3506, & 3509.) In his exception of prescription, Douglas claims ownership through possession of "one, two, three, five, ten, twenty and thirty years," but the only two prescriptive periods for movables are three and ten years.
[2] Phillips v. Fisher, 93-928, p. 3 (La.App. 3d Cir. 3/2/94), 634 So.2d 1305, 1307, writ denied, 94-0813 (La.5/6/94), 637 So.2d 1056.
[3] Id.; Sterling v. Estate of Vicknair, 93-594, p. 3 (La.App. 5th Cir. 1/12/94), 631 So.2d 463, 464.
[4] Jeanfreau v. Jeanfreau, 182 La. 332, 162 So. 3, 5 (1935).
[5] Phillips v. Fisher, 93-928, p. 3, 634 So.2d at 1307.
[6] Wier v. Glassell, 216 La. 828, 44 So.2d 882 (1950).
[7] The trial court's judgment ordered the stock transferred without an endorsement requiring the stock be first offered to other shareholders before it could be sold to outsiders. Douglas appealed only the portion of the judgment regarding the endorsement; the remainder of the judgment became final. See Hayward v. Hayward, 618 So.2d 1028 (La.App. 1st Cir.1993).
[8] The trial court found the total was $301,793.67, but this was due to a confusing listing included in the "assets" of the succession, an account with First National Bank in Donaldsonville with a negative balance of $5,993.33, which the trial court treated as a positive balance.
[9] The trial court in its written reasons apparently made a slight miscalculation, stating they totaled $131,548.31.
[10] The agreement states:

Failure on the part of any party hereto to effect any portion of the above agreement shall constitute grounds for the remaining parties to file suit to enforce compliance with this Agreement and should the terms of this Agreement prevail in said suit, the party reneging on the performance shall be liable to the other parties for all of the costs of said suit to enforce compliance including all court costs and reasonable attorney fees in connection therewith.
[11] At trial she testified $40,316.16 was related to this litigation, but she obviously forgot the $180.00 claimed from the June 21, 1993 bill. See the appendix hereto in which the calculations are detailed.