STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2024 CA 0182

ROBERT J. MELANCON AND LINDA G. MELANCON

VERSUS

THE MEMORIAL HALL FOUNDATION, INC. THE MEMORIAL
HALL MUSEUM, INC., AND JAMES H. COHEN AND SONS, INC.

Judgment Rendered: **SEP 2 0 2024**

* * * * *

On Appeal from the
17th Judicial District Court
Parish of Lafourche, State of Louisiana
Trial Court No. 135917

The Honorable Jennifer F. Richard, Judge Presiding

* * * * *

Jerald P. Block
Sarah M. Lambert
Matthew P. Hymel
Thibodaux, Louisiana

Attorneys for Plaintiffs-Appellees
Robert J. Melancon and Linda G. Melancon


Christopher H. Riviere
Evan M. Zizzi
Michelle E. Riviere
Thibodaux, Louisiana

Attorneys for Defendants-Appellants,
the Memorial Hall Foundation, Inc. and
the Memorial Hall Museum, Inc.

* * * * *

BEFORE: WOLFE, GREENE, AND STROMBERG, JJ.

**WOLFE, J.**

Defendant-appellant, the Memorial Hall Museum, Inc. ("Memorial Hall"), appeals a trial court judgment finding plaintiff-appellee, Linda G. Melancon, individually, and in her capacity as Independent Executrix of the Succession of Robert J. Melancon,[1] to be the owner of a historic rifle used in the Battle of New Orleans, and further ordering Memorial Hall to return said rifle to her. We affirm.

## FACTS & PROCEDURAL HISTORY

In December 1894, C.S. Ross donated a Kentucky Long Rifle ("the rifle") used by his grandfather to the Louisiana Historical Association, a group engaged in the collection and preservation of various items with significant historical value to Louisiana. The rifle is believed to be one of the only confirmed rifles to have been used in the Battle of New Orleans during the War of 1812.[2] During the years that followed the donation, the rifle was stored and occasionally displayed by the Louisiana Historical Association at the Confederate Memorial Hall Museum[3] in New Orleans. The rifle remained at Memorial Hall for several decades, with its last known recorded inventory being in 1951. However, the rifle's location and status following the 1951 inventory is a mystery; Memorial Hall claims the rifle was stolen from its collection at some unknown date.

In December 1982, Mr. Melancon, a collector of Louisiana historical artifacts, learned through a publication entitled The Robb Report that James H. Cohen and

---

[1] Although the Petition for Declaratory Judgment and Damages identified Robert J. Melancon and Linda G. Melancon as plaintiffs, on April 6, 2023, after the filing of the underlying litigation, Robert J. Melancon passed away and Linda G. Melancon, individually, and as Independent Executrix of the Succession of Robert J. Melancon, was later substituted as the proper party plaintiff. Nevertheless, for clarity and succinctness herein, we will simply refer to these individuals as "Mr. Melancon," "Mrs. Melancon," or both as "the Melancons."

[2] The rifle bears an inscription reading, "This rifle was used by my father Wm. Ross Member of Can. Thos. Beal's company of New Orleans riflemen in defence of N Orleans in 1814 & 15. James Ross, 1837."

[3] In 1998, the Louisiana Historical Association donated all of its rights, title, and interest in the items located at the Confederate Memorial Hall Museum to, as it is presently named, the Memorial Hall Museum, Inc.

Sons, Inc., an antiquities dealer in New Orleans, was advertising the rifle for sale at an asking price of $18,000.00. Mr. Melancon met with representatives from James H. Cohen and Sons, Inc.[4], stating that the asking price for the rifle was beyond what he was willing to pay, but the two parties did come to an agreement whereby Mr. Melancon traded a number of other items from his own personal collection for the rifle. An agreement reflecting this trade was signed on December 12, 1982. From December 12, 1982 until November 17, 2017, a span of nearly thirty-five years, the Melancons actively possessed and considered themselves to be the owners of the rifle. They meticulously researched the rifle's history and authored numerous publications concerning it as well as the Battle of New Orleans. The Melancons frequently attended and presented the rifle at gun shows, trade exhibits, and historical displays around the United States.[5] In each of these various outlets, the Melancons were identified and credited as the owners of the rifle.

From 1951 to 2017, the rifle was never reported as stolen by Memorial Hall.[6] Further, Memorial Hall denied it knew the Melancons possessed the rifle from December 12, 1982 through November 17, 2017.[7] Nevertheless, in 2017, Federal Bureau of Investigation ("FBI") Special Agent Randolph J. Deaton, IV ("Agent Deaton") was placed in charge of the FBI's "William Ross [i]nvestigative file" and served as the "primary point of contact with all persons connected to the William Ross Rifle, including but not limited to Robert and Linda Melancon." Agent Deaton

---

[4] James H. Cohen and Sons, Inc., though initially named as a defendant in the Melancons' Petition for Declaratory Judgment and Damages, was later dismissed from the litigation by way of a granting of a Motion for Summary Judgment.

[5] The record reflects nearly twenty articles, dating from 1986 to 2018, in which the rifle was featured. Many of these articles were either authored by Mr. Melancon or attribution and credit was given to him by way of helpful research and materials.

[6] A New Orleans Police Department Report was prepared concerning the rifle, but not until after the November 17, 2017 search of the Melancon residence.

[7] We note, however, that business minutes from Memorial Hall dated January 31, 2017, April 25, 2017, and September 7, 2017, clearly reflect Memorial Hall was aware of the Melancons' possession of the rifle.

then met with Louisiana State Police officials. Louisiana State Police officers applied for and were granted a search warrant for the Melancons' residence. The search warrant specifically noted the rifle constituted evidence of the crime of Possession of Stolen Items, a violation of Louisiana Revised Statutes 14:69. The Melancons were not present at the time of execution of the search warrant on November 17, 2017. In order to gain access to the Melancons' home, Agent Deaton made contact with Mr. Melancon's son-in-law, who provided access to the home three hours later.[8] Agent Deaton then seized the rifle as well as binders containing various documents and photographs related to the rifle.

Between November 17, 2017 and December 19, 2017, Agent Deaton met with or spoke to the Melancons on several occasions, ultimately presenting them with a Federal Bureau of Investigation Waiver of Ownership of Property form. This form stated, in pertinent part, that on November 17, 2017, the FBI seized the rifle from the Melancons' home, that the Melancons understood they had an opportunity to claim the rifle, that if they did not claim the rifle within thirty days of signing, it would be returned to Memorial Hall, and that they "knowingly and voluntarily waive[d] any right, title or interest in this property and agree[d] not to contest the return of this property to [Memorial Hall]."

The Melancons filed a Petition for Declaratory Judgment and Damages on June 25, 2018, seeking a return of the rifle as well as damages resulting from its alleged unlawful seizure. A bench trial was held on September 7 and 8, 2023 resulting in a final judgment dated November 3, 2023, finding the Melancons to be the "lawful and legal owner of the [...] rifle used by William Ross in the Battle of New Orleans[,]" and that Memorial Hall be ordered "to return the [...] rifle used by

---

[8] Specifically, Mr. Melancon averred that he and Mrs. Melancon "were in Houston saying their final good-byes to [Mrs. Melancons'] older brother who was in the hospital dying, [when he] received a phone call from his son-in-law that agents from the [FBI], the Department of Homeland Security, and the Louisiana State Police were all present at his home to take his Kentucky flintlock rifle and would kick his door in to obtain the rifle if necessary."

William Ross in the Battle of New Orleans" to Mrs. Melancon. It is from this judgment that Memorial Hall appeals.

## DISCUSSION

On appeal, Memorial Hall claims the trial court reached certain erroneous factual findings regarding law enforcement's investigation of the rifle, committed legal error by finding the Melancons' consent was vitiated by error and duress, and committed legal error by findings the Melancons did not renounce any ownership title gained by acquisitive prescription.

As discussed above, Mr. Melancon first learned of the rifle through an antiquities publication, visited James H. Cohen and Sons, Inc. to inspect and consider the rifle, then offered a number of historical artifacts from his personal collection in exchange. Though Memorial Hall relies on its bylaws which allegedly prohibit the sale of any item from within its collection,[9] there is nothing in the record to definitively establish that James H. Cohen and Sons, Inc. did not have ownership of the rifle or that it was believed to have been stolen property. In fact, Dr. Keith Cangelosi, President of the Board of Directors for Memorial Hall, specifically testified he does not know how James H. Cohen and Son, Inc. acquired the rifle. Louisiana Civil Code article 2660 sets forth that an exchange is a contract whereby each party transfers to the other the ownership of a thing other than money. Ownership of the things exchanged is transferred between the parties as soon as there is agreement on the things, even though none of the things has been delivered. Based on the documentation reflecting this exchange, we find Mr. Melancon acquired ownership of the rifle as early as December 12, 1982.

---

[9] Both Dr. Keith Cangelosi, President of the Board of Directors for Memorial Hall, and Patricia Ricci, the Curator of Memorial Hall, testified the museum's charter and/or bylaws prohibit the sale or removal of any artifacts from within its collection without unanimous approval by the Board of Directors. However, these documents were not introduced into evidence at trial.

However, assuming, *arguendo*, Mr. Melancon somehow did not acquire ownership, we find the provisions of acquisitive prescription applicable. Acquisitive prescription is a mode of acquiring ownership or other real rights by possession for a period of time. La. Civ. Code art. 3446. All private things are susceptible of prescription unless prescription is excluded by legislation. La. Civ. Code art. 3485. One who has possessed a movable as an owner, in good faith, under an act sufficient to transfer ownership, acquires ownership by prescription after three years. See La. Civ. Code art. 3490. Alternatively, regardless of good faith or title, one who has possessed a movable as owner for ten years acquires ownership by prescription. See La. Civ. Code art. 3491. The party asserting acquisitive prescription has the burden of proving all facts essential to support it. One essential element of a claim of acquisitive prescription is the intent to possess the property as owner; mere physical possession is insufficient. **McKee v. Hayward**, 97-0553 (La. App. 1st Cir. 4/8/98), 710 So.2d 362, 365, writ denied, 98-1784 (La. 10/9/98), 726 So.2d 407.

Based on the record presented before us, it is clear the Melancons intended to possess the rifle as owners, proudly displaying the rifle in their home, loaning the rifle to various historical groups, trade conventions, and gun shows, and writing various articles describing the rifle's unique history in relation to the broader story of the Battle of New Orleans and the War of 1812. The record does not set forth any challenge or claim to the Melancons' possession as owners of the rifle between 1982 and 2017, a period of thirty-five years. As such, we find the Melancons appropriately secured title to the rifle on December 12, 1982 and either from that point, or by three-year or ten-year acquisitive prescription, we find the Melancons were the lawful owners of the rifle, at the latest, by December 12, 1992.

Next, we turn to the issue of whether or not the Melancons renounced any acquisitive prescription benefit accrued to them through acquisitive prescription. Prescription may be renounced only after it has been accrued. La. Civ. Code art.

3449. Renunciation of prescription is a technical term designated the abandonment of rights derived from an accrual of prescription. **Id**. at Comment (c). Further, the renunciation of prescription is not an act translative of ownership; rather, it is a unilateral act that does not require acceptance by the other party. Further, it does not require any formality. **Id**. at Comment (d). Renunciation of prescription destroys the effect of prescription that has already run. **Ruffins v. HAZA Foods of Louisiana,** LLC, 2021-0619 (La. App. 5th Cir. 5/25/22), 341 So.3d 1259, 1263. Renunciation may be express or tacit. Tacit renunciation results from circumstances that give rise to a presumption that the advantages of prescription have been abandoned. La. Civ. Code art. 3450. Louisiana courts have consistently held that the renunciation of prescription must be clear, direct, and absolute, and it must be manifested by words or actions of the party in whose favor prescription has run. **Geiger v. State ex rel. Dept. of Health and Hosp.,** 2001-2206 (La. 4/12/02), 815 So.2d 80, 86; see also **Coleman v. Ace Property & Casualty Ins. Co.,** 2019-0305 (La. App. 5th Cir. 11/27/19), 284 So.3d 1262, 1270 ("[e]ffective renunciation of accrued prescription must be unequivocal[.]").

Memorial Hall claims the Melancons' signing of the FBI Waiver of Ownership of Property form constitutes renunciation of acquisitive prescription. Specifically, it claims the Melancons had over one month to contemplate their alleged ownership of the rifle, agreed to a provision within the form stating they knowingly and voluntarily waived any "right, title or interest in the [r]ifle[,]" and agreed to not contest the return of the rifle to Memorial Hall. Therefore, Memorial Hall argues the trial court erred by failing to find the Melancons renounced any acquisitive prescription benefit. We disagree.

To form a valid contractual agreement, consent is a prerequisite. See La. Civ. Code art. 1927. Further, consent may be vitiated by error, fraud, or duress. La. Civ. Code art. 1948. As to duress, consent is vitiated when it has been obtained by such

7

a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation. Age, health, disposition, and other personal circumstances of a party must be taken into account in determining reasonableness of fear. La. Civ. Code art. 1959. In evaluating duress, the subjective element is the party's personal reaction to circumstances, and the objective elements are the reasonableness of the fear and the unjust injury based on how reasonable persons would react to the circumstances. **Averette v. Industrial Concepts, Inc.**, 95-1286 (La. App. 1st Cir. 4/30/96), 673 So.2d 642, 643, <u>writ denied</u>, 96-1510 (La. 9/20/96), 679 So.2d 442. A trial court must be given great deference in resolving the issue of duress. It is the trial court alone which has the opportunity to evaluate the credibility of the witnesses and to assess their testimony. The trial court's findings of fact will not be set aside unless they are clearly wrong or manifestly erroneous. **Id.** Further, as to error, it vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have bene known to the other party. La. Civ. Code art. 1949. Whether error exists is a factual determination by the trial court, which is reviewed under the manifest error or clearly wrong standard. **Rosell v. ESCO**, 549 So.2d 840, 844 (La. 1989).

We find the Melancons' consent to the Waiver of Ownership of Property form to be vitiated by both duress and error. The Melancons, individuals with no prior criminal history, owned the rifle for nearly thirty-five years. They proudly displayed it in their home and in various exhibits, authored articles describing its history, and engaged in reenactments while using the rifle. Mr. Melancon, a veteran of the Vietnam War, was interested in preserving a piece of military history used in the defense of the United States. Mr. Melancon was also a well-respected member of the antiquities community for many years, largely due to his in-depth research concerning the rifle and generous lending of the rifle to local exhibits.

At no point between December 12, 1982 and November 17, 2017 did Memorial Hall reach out to the Melancons to discuss the circumstances surrounding their ownership of the rifle. Without prior notice or warning, while visiting a dying relative out-of-state, the Melancons received word that six black SUVs containing officials from three law enforcement agencies – the FBI, Department of Homeland Security, and the Louisiana State Police – were at their home with a search warrant for the rifle. The Melancons, away from their home, were told by their son-in-law that law enforcement was threatening to "kick his door in to obtain the rifle, if necessary." Further, this search warrant specifically noted the rifle constituted evidence for the felony crime of possession of stolen goods. Later, when the Melancons returned home, Mr. Melancon met with law enforcement, who asked if he would be willing to wear "a wire" to aid in their investigation of James Cohen and Sons, Inc. Meanwhile, the relative the Melancons visited during the search of their home later passed away. In fact, two other of the Melancons' immediate family members died within a three-week time frame, and this also caused the Melancons to be distracted and distraught.

Agent Deaton described the meeting wherein the Melancons were presented with the Waiver of Ownership of Property form as "very lighthearted and casual conversation [where everyone was] drinking Community coffee around a table[.]". Mrs. Melancon opposed that characterization. She testified that during meeting, her mental state was not stable and that she just "wanted them to leave." In affidavits supplied by the Melancons, both stated that law enforcement made no mention of Memorial Hall and that they were not advised to seek legal counsel. Additionally, the Melancons felt intimated by law enforcement's presence at their home, and they feared the possibility of criminal charges being brought against them. Though Mrs. Melancon testified she did not fully read the Wavier of Ownership of Property form, she stated that it was her belief the sole purpose of the form was that the Melancons

would not file a lawsuit against the FBI, not that they were giving up their ownership rights in the rifle. Mrs. Melancon stated that she would not have otherwise signed the form. Moreover, the Melancons stated they were "embarrassed, humiliated, confused, and wanted this whole ordeal to be ended[,]" and that their reputation was "questioned by fellow collectors, friends[,] and church members about the police presence at [their] home."

Accordingly, we find no manifest error in the trial court's determination that the Melancons' consent to the Waiver of Ownership of Property form was vitiated by both duress and error. Moreover, we find no other examples in the record of express or tacit renunciation of the benefits of acquisitive prescription concerning the Melancons' ownership of the rifle. Therefore, even assuming the Melancons' ownership of the rifle is predicated on acquisitive prescription, we agree with the trial court that such ownership was not renounced.

## CONCLUSION

The trial court's November 3, 2023 judgment is affirmed. Costs of this appeal are assessed to defendant-appellant, the Memorial Hall Museum, Inc.

**AFFIRMED.**